IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JOSE G. NEVAREZ,

      Plaintiff,

v.                                  No. CIV 03-140 LFG

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff Jose G. Nevarez ("Nevarez") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Nevarez was not eligible for disability insurance benefits ("DIB"). Nevarez moves this Court for an order reversing the Commissioner's final decision and remanding for a rehearing. [Doc. 13.]

### Background

Nevarez was born on February 8, 1941 and was 61 years old at the time of the July 2002 administrative law hearing. He has been divorced two times and currently lives alone. Nevarez has a college degree[1] and worked in the education field for a number of years, including in positions of teacher, director, principal and interim superintendent. His past relevant work includes that of teacher and administrator. [Tr. at 68.] He also served in the United States Army from 1960 to 1982 as a

---

[1]At least one record indicates that Nevarez has two Master's Degrees. [Tr. at 98.]

1

specialist in communications, chemicals, personnel and administration.  [Tr. at 75, 86.]  He is a decorated Vietnam veteran.  [Tr. at 75.]

In January 2001, Nevarez submitted an application for DIB, claiming an onset date of April 15, 1999, alleging that his disabilities were such that he could no longer work.  [Tr. at 233.]  He suffers from multiple conditions, including degenerative joint disease of the lumbar spine, right knee problems, right arm, shoulder and/or wrist problems and hypertension.  [Tr. at 22, 54, 233-38.]  His medical records indicate that he is a current tobacco user, has had some problems with alcohol, and is somewhat obese.  He weighs approximately 200-246 pounds and is 5 feet 8 inches tall.  [Tr. at 54, 237.]

Administrative Law Judge David R. Wurm ("ALJ" or "Judge Wurm") held an administrative hearing on July 18, 2002, at which Nevarez was represented.  [Tr. at 232.]  In a decision, dated August 29, 2002, Judge Wurm found that Nevarez was not eligible for benefits.  [Tr. at 13-16.]  Judge Wurm specifically determined that Nevarez had the residual functional capacity ("RFC") to perform light exertion work activity with certain limitations.  [Tr. at 15.]  While the ALJ concluded that Nevarez could not perform his past relevant work, he also decided, after listening to testimony by the vocational expert, that there were other jobs in the economy that Nevarez could perform.  [Tr. at 16.]  On January 3, 2003, the Appeals Council denied Nevarez's request for review.  [Tr. at 3.] This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[2] The burden rests upon the claimant to prove disability throughout the first four steps of this process,

---

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[3]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[4] at step two, the claimant must prove his impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities . . . .,"[5] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[6] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[7]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[8] age, education and past work experience, he is capable of performing other work.[9]

---

[3]20 C.F.R. § 404.1520(a)-(f) (1999); <u>Sorenson v. Bowen</u>, 888 F.2d 706, 710 (10th Cir. 1989).

[4]20 C.F.R. § 404.1520(b) (1999).

[5]20 C.F.R. § 404.1520(c) (1999).

[6]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means his impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[7]20 C.F.R. § 404.1520(e) (1999).

[8]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[9]20 C.F.R. § 404.1520(f) (1999).

If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[10]

The ALJ can meet his burden of proof at step five in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997). For example, expert vocational testimony can be used to demonstrate that the plaintiff can perform other jobs in the economy. Id. at 669-670. In this case, Judge Wurm relied on vocational expert testimony in reaching his decision at step five.

## Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The Court's review of the Commissioner's determination is limited. Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992). The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Id. at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting

---

[10]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

> his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).   If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.   The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner.   Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

After thoroughly and carefully reviewing the medical records, the ALJ concluded that Nevarez was not disabled under the standards of the Social Security Act.   [Tr. at 16.]   In reaching this decision, Judge Wurm made the following findings: (1) Nevarez did not engage in substantial gainful activity during the pertinent time frame;[11] (2) Nevarez had a combination of impairments that were considered "severe" (including documented degenerative joint disease of the right knee, shoulder and wrist, degenerative disc disease and osteo-arthritis of the lumbar spine, hypertension and obesity); (3) these impairments were not severe enough to meet or equal a Listing; (4) Nevarez's assertion that he lacked the RFC to perform a range of light work activity was not credible; (5) Nevarez retained a RFC to perform light exertion work activity with limitations; (6) he was unable to perform his past relevant work; and (7) vocational testimony supported a finding that there were jobs available both nationally and regionally that Nevarez could perform.   [Tr. at 13-16.]

In this appeal, Nevarez argues that reversal and remand are required because the ALJ failed to give proper weight to the Veterans' Administration ("VA") Rating Decision, and because the

---

[11]Although Judge Wurm gave Nevarez the benefit of the doubt, the ALJ noted that there was some conflict in the record regarding Nevarez's earnings and work history as to whether he engaged in substantial gainful activity after his alleged onset date of April 15, 1999.   [Tr. at 14.]   Indeed, Nevarez stated that he stopped working when he had arthroscopic right knee surgery.   [Tr. at 54-55.]   However, that surgery occurred in April 2000, rather than April 1999.   [Tr. at 115.]   It appears from the records that Nevarez did work to some extent in 1999 and 2000, and yet his recitation of work history stops in 1998.   [Tr. at 14, 68, 86.]

ALJ's finding that Nevarez could perform a significant number of light jobs in the economy was not supported by substantial evidence and was erroneous. [Doc. No. 14.] The Commissioner argues that the ALJ's decision should be affirmed because the ALJ properly considered the VA's rating decision and because the decision was supported by substantial evidence in the record. [Doc. 15.]

After a careful review of the entire record, this Court finds that the ALJ's properly considered the VA's disability rating and findings and that the ALJ's decision was supported by substantial evidence. The Court also concludes that there was no error in Judge Wurm's decision. Therefore, Nevarez's motion to reverse and remand will be denied.

### Summary of Nevarez's Work History, Medical Conditions and Treatment

From 1986 to 1990, Nevarez was a business teacher. From 1990 to 1993, he was a Director of Instruction, and from 1994 to 1998 he was a middle school principal. [Tr. at 68.] He also appears to have worked as a director of federal programs from 1995 to 1998. During part of 1998, Nevarez was an interim superintendent. [Id.] Many of his positions involved the supervision of a significant number of employees. In 1993-94, and in 1982-85, he attended graduate schools. [Tr. at 86, 87.]

From Nevarez's recitation of his work history, he does not appear to have worked after some point in 1998. It is not clear from the records why he stopped working in 1998, although there are references in the record indicating that he had a right shoulder arthroscopic clavicle excision in October 1998, relating to an injury from a motor vehicle accident. [Tr. at 166.]

The first medical records in this administrative record begin in 1999. As a veteran, Nevarez received most of his medical care through the VA. A June 1999 record indicates that Nevarez had participated in a Salvation Army six-month long treatment program for alcohol abuse related to his second DWI. The record also shows that Nevarez's alcohol dependency was in remission at that

point.  [Tr. at 181.]  In June 1999, he complained of lower back pain, and in July 1999, he attended a follow-up visit related to the 1998 shoulder procedure.  [Tr. at 166.]  The 1999 medical records show miscellaneous complaints and a few failures by Nevarez to keep scheduled appointments, but none of the records provide an explanation for his stated onset date of April 15, 1999 as to the alleged disabilities.  [Tr. at 157-181.]  Moreover, there is no discussion in these records that Nevarez was working or unable to work for some reason during 1999.

In 2000, Nevarez was examined for knee pain.  He had injured his knee in 1972 in a military vehicle accident but had not experienced many problems with it until suddenly in 2000.  [Tr. at 107.] On February 7, 2000, he stated that he developed a sudden onset of sharp pain to his right knee in the prior two or three months.  He experienced episodes of locking and giving away in the knee.  [Tr. at 169, 170.]  In February, he was given a cane and referred to physical therapy and orthopedics.  [Tr. at 154.]  He also was taking Naproxen[12] which he had used for several years for other orthopedic problems.  [Tr. at 107.]

An MRI indicated a meniscal tear in his right knee, and he agreed to an arthroscopy procedure in April 2000.  [Tr. at 107, 115, 116, 152.]  After the April 27 procedure, he was ambulating without trouble, but using crutches.  [Tr. at 107.]  Surgery notes indicate that Nevarez had a complex degenerative tear.  [Tr. at 115, 167.]

Several weeks after the surgery, he still complained of pain but was getting better.  He was walking with a cane, and the doctor anticipated that Nevarez could not work for another 4-6 weeks. This is the only mention in the medical records of Nevarez's ability to work or temporary inability to work.  [Tr. at 113.]  On May 25, 2000, Nevarez was still uncomfortable placing his entire weight on

---

[12]Naproxen is a nonsteroidal anti-inflammatory drug.  Physician's Desk Reference (57th ed.), p. 2891.

the right knee.  The doctor noted no effusion and a range of movement of 0/90.  He planned to wean Nevarez from the crutches as tolerated.  [Tr. at 112.]  Subsequently, in July, Nevarez did not show up for one of his scheduled appointments.  [Tr. at 110.]  On July 26, he kept an appointment related to his knee surgery where the provider indicated that no definite surgical clips were seen and that there was no gross evidence for acute fracture.  [Tr. at 143.]

On October 3, 2000, Nevarez called the VA clinic to complain of pain in his right knee that had started up two weeks ago.  He was having trouble walking and needed to be seen for depression.  [Tr. at 111.]  He also stated that he was awaiting an administrative hearing on his request for total disability and needed to reschedule his appointment because of that hearing.  [Tr. at 111.]  This reference to a hearing apparently was before the VA.  An October 19 medical record indicates that Nevarez came in for re-fills of his medications and that he frequently canceled or did not show up for scheduled appointments during the last year.  [Tr. at 111.]

On October 10, Nevarez was seen for his knee problems.  He was bothered by cold weather and was still taking Naproxen.  [Tr. at 109.]  On October 25, he visited the Emergency Room and complained of numbness in the left upper arm and left thigh.  A neurology consult and MRI were recommended.  [Tr. at 174.]

On October 26, Nevarez was seen for depression and excessive alcohol intake.  He had been drinking around twelve beers a night, three to four times a week for a period of two weeks.  He reported feeling depressed subsequent to being out of work after his knee surgery.  He was experiencing severe financial hardship and was frustrated that he could not stop drinking on his own.  [Tr. at 132.]

Nevarez was admitted to an early intervention program on November 2, 2000. [Tr. at 128.] He reported having been hospitalized six times over the years for medical problems and that he had chronic problems with his kidneys, arthritis and knee. The VA social worker interviewer indicated that Nevarez had a 40% disability rating with respect to chronic problems with his back and right knee. [Tr. at 129.] Nevarez did not have a valid driver's license then or a car. He reported having four DWI's over the years and considered treatment for alcohol at that time to be extremely important. [Tr. at 130.] He further explained that he had one prior substance abuse problem in 1997 when he received treatment from the Salvation Army. He relapsed in April/May of 2000. He tended to drink daily until he ran out of money. His usual pattern was to drink about seven beers although he said it could have been more. [Tr. at 132.]

Nevarez described himself as getting along with people well, although he had experienced serious problems in getting along with sexual partners or spouses. [Tr. at 131.] He previously was never treated for psychological problems but presently felt depressed and anxious. He felt that his depression was due to medical and economic problems resulting from his inability to work. [Tr. at 131.] He stated that he liked to read and write and to play the guitar. When he worked, he liked to dance and travel. [Tr. at 131.]

On November 9, 2000, Nevarez had a MRI of his lumbar spine. He complained of posterior neck pain, left shoulder pain, lower back pain and left anterior thigh pain. [Tr. at 184.] The results showed that his vertebral bodies were normal and that there were only mild disc bulges. He had no significant stenosis but he had very severe left-sided facet arthropathy[13] at L5-S1, which could abut the exiting L5 nerve root. [Tr. at 141.]

---

[13]Arthropathy means any disease affecting a joint. Stedman's Medical Dictionary (26th ed.), p. 150.

9

On November 22, he complained of a painful right wrist, but no fracture or dislocation was seen in the x-rays. [Tr. at 140.]

On December 14, 2000, the Department of VA issued a rating decision related to Nevarez's claim for increased evaluation filed on August 17, 2000. He filed a claim for increased benefits related to his kidney stone condition, back, and right wrist, hand and knee problems. [Tr. at 186.] The VA decided that Nevarez was entitled to (a finding of) individual unemployability effective October 3, 2000. An evaluation of lumbrosacral strain with traumatic arthritis, which had been 10% was now increased to 40% disability. His right wrist lunate bone fracture, which was rated at 10% disability, continued at that rate. The evaluation of a fracture to his right tibial plateau, status post medial meniscectomy, which was currently rated at 20% disability, was continued at that rate. [Tr. at 187.]

The VA's findings appear to rely, in part, on VA treatment reports from 5/11/00 to 10/24/00 and on a VA examination, dated November 21, 2000. [Tr. at 187.] It does not appear that the November 21 examination is included in this administrative record. The VA concluded that because of Nevarez's increased evaluation for his lumbrosacral strain with traumatic arthritis, he now met the (VA) schedular criteria for individual unemployability. [Tr. at 187.] The Va commented that no medical evidence demonstrated that Nevarez was capable of gainful employment with his "service connected back and right wrist disabilities." Under VA standards, reasonable doubt concerning his inability to be gainfully employed due to service connected disabilities was to be resolved in his favor. [Id.] Thus, the VA found Nevarez unable to work.

On January 1, 2001, shortly after the VA made its findings, Nevarez applied for DIB. Apparently, an earlier application for DIB was rejected in 1985. [Tr. at 50.] In the face to face

meeting, the interviewer observed no problems with Nevarez' ability to sit, stand, walk, or use of his hands, with the exception that he had some trouble signing his name on forms. He had a cane but did not appear to touch the cane to the floor. [Tr. at 52.]

In a daily activities questionnaire, Nevarez wrote that he could not walk far and could not dance at all. He could not walk two blocks on level ground, although he could walk to and from the car. He could not climb stairs. He needed a cane because of his bad balance. He used his cane every time he stood. He could not do small things with his hands and did not buy shoes with shoestrings anymore. [Tr. at 64.] Nevarez had no trouble getting along with others or being out in public.

On February 2, 2001, a VA treatment record shows that he was referred to the Behavioral Medicine Consult for depression and an evaluation. He told the interviewer that he stopped working about a year earlier when he took time off for his knee surgery. He had planned to return to work but was unable to work and began to drink excessively. Nevarez encountered financial difficulties but now had resolved most of his debt based on the recent VA finding of disability. The record notes that, as of this date, Nevarez had resumed most of the activities he found enjoyable, his sleep improved, and he was involved in a supportive relationship. He worked out in a gym three times a week. He enjoyed playing the guitar. Nevarez observed that his limited mobility was the remaining issue that impacted his maximum recovery. [Tr. at 97.] Nevarez believed that the substance abuse treatment was of paramount importance at that time, rather than the depression. [Tr. at 99.] The interviewer noted that he walked with a cane and grimaced when sitting and shifting his weight. He was assigned a GAF of 70. [Tr. at 99, 100.] He was referred again to physical therapy.

On March 2, 2001, Nevarez was seen for chest pain. He complained of sudden onset, sharp pain that improved with rest. He also noted that he had a history of not breathing when asleep and

that he tended to fall asleep during the day.  Further testing showed a normal heart and no acute cardiopulmonary disease.  [Tr. at 95, 102.]  He declined tobacco education at this time and was still smoking.  [Tr. at 97.]

On March 6, 2001, a Physical RFC Assessment was performed.  Nevarez was given the following exertional limitations: occasional lifting of 20 pounds, frequent lifting of 10 pounds, 6 hours of standing and walking, 6 hours of sitting, and unlimited ability to push and pull.  He had occasional postural limitations in his abilities to climb, balance, stoop and kneel.  He had limitations in the ability to reach but was unlimited in his abilities to handle, finger and feel.  Dr. Finnegan concluded that he appeared capable of light work.  [Tr. at 199.]

A March 19, 2001 medical record indicates that Nevarez's chest pain had resolved since his last visit and that his hypertension was under good control.  [Tr. at 94.]  On April 10, he was seen by Orthopedics regarding knee problems.  He reported always using his cane and that he felt fluid in his knee.  The provider noted that he would be a candidate for arthroplasty[14] in the future but due to Nevarez's father's longevity, it was felt that it should be postponed as long as possible so as to avoid additional loss of activities.  [Tr. at 93.]  An April 10 x-ray of the right knee indicated mild degenerative changes to the patellar femoral joint and lesser degrees of medial and lateral knee compartments in comparison to July 2000 films.  The findings suggested possible minimal joint space narrowing of the medial compartment.  [Tr. at 102.]

On May 8, 2001, Nevarez filed a Reconsideration Disability Report, stating that he was going to have a knee replacement, he was being treated for pancreatitis, and he would be undergoing some

---

[14]Arthroplasty is the creation of an artificial joint.  Stedman's Medical Dictionary (26th ed.), p. 150.

sort of cardiac procedure in the near future which would require that he be in a wheelchair.[15]  He also had a sleep apnea test set in July.  The social security interviewer observed that Nevarez had trouble walking.  He needed the use of his cane.  [Tr. at 76-81.]

On May 24, 2001, the medical provider listed Nevarez's active problems as obesity, chronic back pain, degenerative joint disease, nephrolithiasis (presence of renal calculi), pain in the right shoulder joint, tobacco use disorder, continuous tear of medial cartilage or meniscus of knee, hypertension and hypertriglyceridemia.  He was doing well without cardiac or respiratory symptoms.  [Tr. at 90.]

On June 13, Nevarez had an EMG for the evaluation of ulnar nerve lesion in his right arm.  He complained of numbness for three months, and tingling with pain and weakness.  However, he noted that driving did not affect it.  Nevarez's obesity and tobacco use were noted.  The test indicated no atrophy, normal sensation in the hands, normal strength in the right arm, and normal sensory and motor studies in the right median.  He appeared to have an "early hint" of carpal tunnel syndrome with mild severity.  [Tr. at 89.]

On July 1, 2001, Nevarez was diagnosed with severe sleep apnea at the Lovelace Sleep clinic, and he was issued a breathing machine ("CPAP").  [Tr. at 83.]

On September 11, 2001, Nevarez still complained of his right knee and a little pain.  He used his cane.  There was no effusion noted.  He was able to help out his elderly father.  [Tr. at 223.]  On October 18, 2001, additional films were taken of Nevarez's right knee to determine whether there was any further joint destruction to explain his symptoms.  [Tr. at 224.]  The findings indicated that

---

[15]Although the orthopedic specialist said that Nevarez would be a candidate for arthroplasty, none was scheduled at that time.  There are no treatment records indicating that Nevarez was being treated for pancreatitis and/or that he was going to be in a wheelchair.  It is unclear what cardiac procedure Nevarez was referring to or whether he had to use a wheelchair for any length of time.

13

the bones of the knee were well corticated and well mineralized.  There was mild peaking of the tibial spine.  The patella was well approximated to the femur and no effusion was identified.  There was no interval change in the degenerative changes.  He had mild joint degenerative joint disease with no interval change.  [Tr. at 225.]

At the July 18, 2002 administrative hearing, Nevarez testified, through leading questions from his representative, that his joint disease spread through his lower and upper limbs to the point where he could not work at the computer.  [Tr. at 233-34]  He also agreed with his representative that he had chronic back problems and disturbed sleep.  [Tr. at 234.]  He testified that his hypertension was controlled with medication.  [Tr. at 234, 237.]

Upon questioning from the ALJ, Nevarez stated that he had three major disabilities.  Since he could not place weight on his right knee, he placed the weight on his left knee and he no longer could stand or walk for any time.  He had had operations on his right harm, and he had limited motion in his right wrist, especially the forefingers which he said he could not move.  He also testified that he had chronic pain in his back.  While he testified about back pain, he also stated that he controlled it through Naproxen.  [Tr. at 235-36.]  He claimed to have carpal tunnel syndrome of the right wrist but believed the Naproxen helped that pain as well.  [Tr. at 236.]

He admitted that he had been advised to lose weight to try to ease his back pain and other problems but he was unable to do it.  [Tr. at 237.]  He cooked for himself and stated it was hard to give up the ethnic foods with which he was raised, even though he knew he needed to be more diligent about his eating habits.  [Tr. at 238.]  He was able to do some of his own grocery shopping.  He was no longer able to golf, bowl or dance, which he used to love to do.  [Tr. at 239.]  Nevarez said he went to music concerts and played the guitar pretty well.  He read poetry and watched TV.

14

When asked if he smoked, he said he was "not a smoker really," even though the medical records indicate a consistent use of tobacco and recommendations for tobacco education.  [Tr. at 240.]

The ALJ then asked questions of the VE.  Judge Wurm presented a hypothetical to VE Bowman of someone limited to light exertion work with no prolonged walking or standing, occasional postural movements, no prolonged gripping, handling or fingering on the right, no climbing ladders and minimal climbing stairs.  [Tr. at 241-42.]  Based on that hypothetical, the VE testified that Nevarez could not perform his past relevant work.  However, she determined that he had the transferable skills to be a tutor which was a light job and which was available in sufficient numbers in the economy.  [Tr. at 242.]

### Discussion

Nevarez first argues that the ALJ failed to give proper weight to the VA's disability findings and ratings.  His second argument concerns the ALJ's determination that other jobs existed in the economy that Nevarez could perform.

## I.  WEIGHT TO BE ASSIGNED TO VA DISABILITY RATING

"[Disability] findings by other agencies are not binding on the Secretary, [but] they are entitled to weight and must be considered."  Baca v. Dep't of Health and Human Services, 5 F.3d 476, 480 (10th Cir. 1993) (internal citation omitted).  *See also* McQueeny v. Barnhart, 2004 WL 34877 at *6 n. 2 (D. Kan. 2004) (disability determinations by other agencies are not binding and while entitled to consideration, may be discounted with proper explanations by the ALJ).  When an ALJ discounts or rejects the VA's disability determination, he or she should state the reasons for doing so.  Weers v. Barnhart, 2002 WL 69512 at *4 (D. Kan. Jan. 15, 2002) (*citing* Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998)).

Here, Judge Wurm discussed the VA findings throughout his opinion. He noted that the VA gave Nevarez a 40% disability rating for his back, which was not indicative of totally ineffective ambulation as required to satisfy Step 3 listing criteria. [Tr. at 14.] The ALJ also commented that the VA did not rate Nevarez for his knee impairment[16] or for his shoulder disability. [Tr. at 14-15.] Judge Wurm acknowledged that the VA was Nevarez's primary treating source and that the VA rated Nevarez as "disabled," but indicated that he was not bound by the VA opinion due to the differing standards of disability involved. [Tr. at 15.] More specifically, the ALJ explained that the VA's ratings were expressed in a percentage of function loss but that the VA never described a total inability to engage in any work activity as defined by the Social Security Act. Indeed, the VA decision indicates that there was no evidence received to indicate Nevarez could work and therefore, that any reasonable doubt concerning Nevarez's inability to be gainfully employed due to his service connected disabilities must be resolved in his favor. [Tr. at 187.] This simply is not the standard for assessing disability under the Social Security Act. *See* 20 C.F.R. § 404.1520.

In this case, there never is an explanation linked to the objective medical evidence as to why Nevarez quit working or the exact date when he stopped working. He claims to have stopped working in April 1999, and yet no medical records for that year indicate that he could not work. However, he did enter a six month alcohol treatment program possibly during 1999.[17] [Tr. at 181.]

---

[16]The ALJ may have been mistaken as to the VA's failure to give Nevarez a rating for his knee condition. The VA decision noted that the evaluation of fracture right tibial plateau status post medial meniscectomy (removal of meniscus usually from a knee joint) was currently 20% disabling. [Tr. at 190.] However, it appears from the opinion that Nevarez sought an extension to convalescence for his right knee surgery, and that this request was denied because Nevarez did not establish that his condition required surgery involving at least one month of convalescence, surgery with severe postoperative residuals, or treatment with immobilization by cast, in accordance with VA regulations. [Tr. at 186, 190.]

[17]One record indicates he entered this program in 1997; another record implies that he may have attended the program in 1999. [Tr. at 132, 181.]

In April 2000, Nevarez had surgery on his right knee.  He stated that he stopped working when he had the surgery so that he could recover from the operation, and yet there are records reflecting some earnings for the year 2000.  At the time of his surgery, an exam showed that Nevarez had a full range of motion in his right knee, notwithstanding the fact that the surgery confirmed a tear. [Tr. at 107.]  As of May 2000 (after the surgery), his doctor anticipated that Nevarez would be out of work for only 4-6 weeks more.  There is absolutely no objective medical evidence documenting Nevarez's inability to work, beyond those 4-6 weeks.

The record does demonstrate, however, that Nevarez was able to get to and from his frequent medical appointments during 2000.  He was also drinking heavily beginning in April or May 2000, and in October-November 2000, when he was admitted in an early prevention program.

In 2001, there was one occasion when Nevarez was observed to not really rely on the cane he was carrying, and yet a day after this observation, he contended that he could not walk without the cane.  In February 2001, he was enjoying a personal relationship and able to work out in the gym three times per week.  He was able to play the guitar.  In March, his hypertension was noted to be well controlled by medication.  A June 2001 record indicates that driving did not affect Nevarez's complaints of numbness in his right arm, and yet he claimed not to be driving.  Any carpal tunnel syndrome that he experienced was concluded to be of mild severity.  An MRI of his knee in late 2001 did not substantiate his continuing symptoms.

In 2002, he claimed he could not use the computer at work due to hand and wrist problems, and yet he was able to play the guitar.[18]  He stated he could not stand or walk for any length of time, yet he was able to get around by public transportation and continue to keep doctor's appointments.

---

[18]According to Plaintiff's brief, Nevarez is right handed.

17

Case 1:03-cv-00140-LFG   Document 18   Filed 02/06/04   Page 18 of 20

He was able to cook as well, do some grocery shopping, and go to musical concerts, all of which require some standing and walking.  A claimant's daily activities may be considered, along with other evidence, in determining whether the claimant is entitled to disability benefits.  *See* <u>Smith v. Barnhart</u>, 2002 WL 1023678 *2 (10th Cir. May 22, 2002); <u>Gossett v. Bowen</u>, 862 F.2d 802 (10th Cir. 1988).

In addition the RFC Assessment supported the assessment that Nevarez could perform light work and is not necessarily inconsistent with the VA's disability determination since that determination narrowly decides ratings (by percentage) of disability rather than the individual's remaining ability to work with certain limitations.  Moreover, the VA's determination relied on a limited number of medical treatment records, in comparison to the number of records evaluated by the ALJ in this case.

For these reasons, the Court concludes that the ALJ properly considered and discounted the VA's determination of disability and adequately explained in his decision why he did not give greater weight to the VA evaluation.  In addition, the Court finds that substantial evidence supports the ALJ's determinations with respect to Nevarez's ability to perform light work with limitations.

## II.   ABILITY TO PERFORM LIGHT JOBS THAT EXIST IN THE ECONOMY

Nevarez first argues that the ALJ's conclusion that he could perform the light and skilled job of tutor (with an SVP of 7[19]) was erroneous.  According to Plaintiff, if Nevarez could not perform his prior relevant work of teacher or administrator (with an SVP of 7), which were also light and skilled jobs, it follows that Nevarez could not perform the tutor position.  The ALJ concluded, based on vocational testimony, that Plaintiff could perform the job of tutor, which would accommodate

---

[19]The Dictionary of Occupational Titles assigns an SVP to each job it lists.  SVP is defined as "the amount of lapsed time required by a typical worker to learn the techniques,  acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  U.S. Dep't of Labor, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, App. B, B-1 (1993).

18

Nevarez's physical limitations, including the need to avoid prolonged standing and walking, reaching and climbing. The fact that both types of jobs have the same SVP makes no difference in this case, as the SVP does not concern the physical limitations at issue which were taken into account by the hypothetical presented to the VE. Here, the Court determines that substantial evidence supports the ALJ's findings regarding the limited nature and effect of Nevarez's impairments.[20] Moreover, Nevarez does not argue that the ALJ's hypothetical to the VE failed to sufficiently relate to Nevarez's impairments. In addition, Nevarez has not advanced reasons why he cannot perform the job of tutor, even in fields different than his speciality in business education. Thus, under these circumstances, the Court concludes that the VE's testimony serves as substantial evidence to support the ALJ's denial of benefits at step 5, and that the Commissioner satisfactorily satisfied her burden at step 5 of the sequential process. See Gay v. Sullivan, 986 F.2d 1336, 1341 (10th Cir. 1993) (expert's testimony provided a proper basis for the ALJ's adverse determination).

The Court also rejects Nevarez's argument that there was no evidence elicited to show that he could perform sustained work. Nevarez appears to contend that because he is of advanced age and does not drive, he would be unable to keep a job. The Court finds no basis in the record for the contention that Nevarez's age prevents him from working on a sustained basis or that his transportation needs interfere with his ability to work. Indeed, he appears to use public transportation and/or other modes of transportation to get to appointments. Moreover, this is not a case like Ricketts v. Apfel, 16 F. Supp. 2d 1280 (D. Colo. 1998), where the claimant was homeless and without transportation. The Court, therefore, concludes that substantial evidence supports the ALJ's

---

[20]Plaintiff does not expressly challenge this aspect of the ALJ's decision.

findings at Step 5 in reference to work that Nevarez is able to perform, notwithstanding his limitations.

      For all of these reasons, the Court determines that substantial evidence supports the ALJ's findings and that he committed no error.

      IT IS THEREFORE ORDERED that Nevarez's Motion to Reverse or Remand Administrative Agency Procure [Doc. 13] is denied for the reasons stated herein and that this matter is dismissed, with prejudice.

Lorenzo F. Garcia
Chief United States Magistrate Judge